## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 3:19CR 251 (HPS)** |
| | : | |
| -v- | : | |
| | : | |
| **OLEG KOSHKIN AND** | : | **October 3, 2019** |
| **PAVEL TSURKAN** | : | |

## PROSECUTOR'S AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF PAVEL TSURKAN

I, Vanessa Richards, being duly sworn, depose and state:

1.     I am a citizen of the United States and a resident of the State of Connecticut.

2.     I received my Juris Doctor degree from the University of Pennsylvania School of Law, and I was admitted to the Bar of New York in 2004.   From 2011 to the present, I have been employed in the Office of the United States Attorney for the District of Connecticut as an Assistant United States Attorney. I am assigned to the National Security and Cyber Crime Unit.   As an Assistant United States Attorney, my duties include the investigation and prosecution of persons charged with criminal violations of the laws of the United States, including violations of the computer crime laws and conspiracy to commit those offenses.   During my tenure as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States, including the computer crime and conspiracy laws.

3.     This affidavit is submitted in support of a request by the United States of America to Estonia for the extradition of Pavel Tsurkan, who is also referred to in this request by his last name, "TSURKAN," or the "defendant."

4.     In the course of my duties as an Assistant United States Attorney, I have become familiar with the evidence and the charges in the case against TSURKAN, captioned *United States*

*of America v. Oleg Koshkin and Pavel Tsurkan*, 3:19CR251(MPS), pending in the United States District Court for the District of Connecticut. This affidavit does not detail all of the evidence against TSURKAN that is known to me, but only the evidence necessary to establish a basis for the extradition request. I have confirmed the facts of this affidavit with Special Agent Conor Phoenix of the United States Federal Bureau of Investigation ("FBI"), who is assigned to investigate this matter.

## SUMMARY OF THE CASE

5.     From at least 2010 until April 2017, an individual named Peter Levashov ("Levashov")[1] operated a botnet[2] named "Kelihos", which he used to send spam[3] e-mails and harvest e-mail credentials (such as e-mail addresses, user names, and passwords) from computers infected with the Kelihos malware and to distribute ransomware.[4] Those seeking to have their spam or ransomware distributed by Kelihos paid Levashov, who then commanded the botnet to issue the spam or distribute the malware. From May 2014 to April 2017, Levashov paid a crypting service called Crypt4U to crypt the Kelihos malware so that, when the malware was distributed to victims, anti-virus software on any victim's computer would not detect it.

6.     Pavel Tsurkan and Oleg Koshkin worked for Crypt4U in various capacities and handled the "backend" services for Crypt4U, such as writing the code to automate the process of crypting malware, including Kelihos, and providing the infrastructure for Crypt4U.   Levashov

---

[1] Peter Levashov is known to also use the aliases Petr Levashov, Peter Severa, Petr Severa, and Sergey Astakhov.
[2] A botnet is a network of computers infected with malicious software, controlled as a group without the owners' knowledge, and used for purposes of which the legitimate owners are unaware.
[3] Spam is unsolicited, usually commercial, messages (such as e-mails, text messages, or Internet postings) sent to a large number of recipients or posted in a large number of places.
[4] Ransomware is a type of malicious software designed to encrypt computer data thus rendering it inaccessible to the legitimate owner until a sum of money is paid.

communicated directly with Pavel Tsurkan and Oleg Koshkin about his malware, and both Pavel Tsurkan and Oleg Koshkin knew that they were assisting Levashov in the distribution of malware.[5]

7.      Attached hereto as **Exhibit A** is the affidavit of FBI Special Agent Phoenix. Special Agent Phoenix's affidavit describes the facts of the conduct alleged in the Indictment.

## PROCEDURAL HISTORY OF THE CASE

8.      An Indictment is a formal accusation or charging document issued by a grand jury, which is a part of the judicial branch of the United States government. A grand jury consists of 16 to 23 citizens impaneled to review evidence of crimes presented to it by the United States law enforcement authorities. Each member of the grand jury must review the evidence presented and determine whether there is sufficient evidence to believe that a crime has been committed and that it is likely that the defendant committed the crime. The grand jury may return an Indictment charging the defendant with a crime when at least 12 grand jurors determine that it is more likely than not that the defendant committed the crime. After an Indictment is returned, the court will normally issue a warrant for the arrest of the defendant.

9.      On 28 August 2019, a criminal complaint was filed in the District of Connecticut, alleging that from May 2014 to April 2017, TSURKAN and his conspirators intentionally caused damage to victim computers by crypting malware, specifically, the Kelihos malware, in order to bypass anti-virus software and infect computers with Kelihos, which would then be used to send spam e-mails, harvest e-mail credentials (such as e-mail addresses, user names, and passwords),

---

[5] On April 7, 2017, Spanish authorities arrested Levashov in Spain based upon a criminal complaint and arrest warrant issued in the District of Connecticut. At the time of Levashov's arrest, Kelihos infected at least 50,000 computers. He was extradited to the United States. On September 12, 2018, Levashov pleaded guilty to various computer and wire fraud charges stemming from his operation of the Kelihos botnet.

3

and distribute ransomware. Pursuant to this criminal complaint, the Court also issued a warrant for TSURKAN's arrest.

10. On 6 September 2019, Estonia authorities arrested TSURKAN pursuant to that U.S. arrest warrant.

11. On 3 October 2019, a federal grand jury, sitting in Bridgeport, Connecticut, returned a criminal Indictment captioned, *United States of America v. Oleg Koshkin and Pavel Tsurkan*, 3:19CR~~35~~(~~HB~~), formally charging TSURKAN with two counts relating to computer crimes.

12. The two counts charged against TSURKAN are as follows:

**Count 1:** Conspiracy to Intentionally Cause Damage to a Protected Computer, in violation of Title 18, United States Code, Section 371, which carries a maximum penalty of 5 years imprisonment.

**Count 2:** Intentionally Causing Damage to a Protected Computer, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and 2, which carries a maximum penalty of 10 years imprisonment.

13. The offenses for which TSURKAN was charged in the Complaint and the counts for which he was charged in the Indictment are exactly the same.

14. It is the practice of the United States District Court for the District of Connecticut to retain the warrant of arrest and Indictment and to file them with the Clerk of the Court. I have therefore obtained from the Clerk of the Court a certified true and accurate copy of the arrest warrant issued for TSURKAN, which is attached to this affidavit as **Exhibit B**, and a certified true and accurate copy of the Indictment, which is attached to this affidavit as **Exhibit C**.

15. The federal statutes or relevant portions of the federal statutes that are pertinent to this case are attached hereto as **Exhibit D**. Each of these statutes was a duly-enacted law of the

United States at the time that the offenses were committed, the Complaint was filed, and the Indictment was returned, and they remain in full force and effect.

### A.    Count One: Conspiracy

16.    Count One charges TSURKAN and others with conspiracy to commit fraud and related activity in connection with computers in violation of 18 U.S.C. Section 371.   Under United States law, a conspiracy is an agreement to commit one or more criminal offenses.   The agreement on which the conspiracy is based need not be expressed in writing or in words, but may simply be a tacit understanding by two or more persons to do something illegal.   Conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member.   A person may become a member of a conspiracy without full knowledge of all of the details of the unlawful scheme or the identities of all the other members of the conspiracy.   If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, he is guilty of conspiracy, even though he may play only a minor part.   A conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership.

17.    The crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive offense."   Consequently, a conspirator can be found guilty of the crime of conspiracy to commit an offense, even where the underlying substantive offense that was the purpose of the conspiracy is not committed.

18.    To satisfy its burden of proof and convict TSURKAN under Count One of the indictment - conspiracy to commit fraud and related activity in connection with computers – the government must establish beyond a reasonable doubt each of the following essential elements: (1) that two or more persons, in some way or manner, agreed to try to accomplish the common and

5

unlawful plan charged in the Indictment; (2) that the defendant knew the unlawful purpose of the plan and willfully joined it; and (3) that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the Indictment to further some objective of the conspiracy. The maximum penalty for a violation of the offense charged in Count One is five years' imprisonment; a fine of the greater of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; three years' supervised release; and a mandatory $100 special assessment.

### B. Count Two: Intentional Damage to a Computer

19. Count Two of the Indictment charges TSURKAN and others with aiding, abetting, commanding, counseling, or procuring the commission of a substantive crime as provided by Title 18, United States Code, Section 2. Title 18, United States Code, Section 2 states that whoever commands, procures, assists in, or causes the commission of a crime shall be held accountable and punished in the same manner as the principal, or the person who actually carried out the task. This means that the guilt of TSURKAN also may be proved even if he did not personally perform every act involved in the commission of the crime charged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished through direction of another person as an agent, or by acting together with, or under the direction of, another person or persons in a joint effort. So, if the acts or conduct of an agent, employee, or other associate of TSURKAN were willfully directed or authorized by him, or if TSURKAN aided and abetted another person by willfully joining together with that person in the commission of a crime, then the law holds TSURKAN responsible for the conduct of that other person, just as though he had engaged in such conduct himself.

6

20.     To satisfy its burden of proof and convict TSURKAN under Count Two of the Indictment - intentional damage to a protected computer - the government must establish beyond a reasonable doubt each of the following essential elements: (1) the defendant knowingly caused or attempted to cause the transmission of a program, information, code, or command to a protected computer; (2) as a result of such conduct, the defendant intentionally caused or attempted to cause damage to a protected computer without authorization; and (3) as a result of such conduct, the defendant caused or attempted to cause loss of $5,000 or more during any one-year period or damage affecting 10 or more protected computers during any one-year period.   The maximum penalty for a violation of the offense charged in Count One is 10 years' imprisonment; a fine of the greater of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; three years' supervised release; and a mandatory $100 special assessment.

21.     TSURKAN has not been tried or convicted of the offenses charged in the Indictment, nor has he been sentenced in connection with this case.

## C.     STATUTE OF LIMITATIONS

22.     I have also included, as part of **Exhibit D**, the true and accurate text of Title 18, United States Code, Section 3282, which provides the statute of limitations for the crimes charged in the Indictment.   The statute of limitations requires that a defendant be formally charged within a certain period from the date on which the offense or offenses were committed.

23.     I have reviewed the applicable statutes of limitations.   Because the applicable statute of limitations for Counts One and Two is five years, and because the Indictment charges

criminal violations extending through April 7, 2017, the prosecution of the charges in this case are not barred by the statutes of limitations.

### D. DESCRIPTION OF THE ACCUSED

24.     TSURKAN is an Estonian citizen, born on 2 January 1988 in Tallinn, Estonia. TSURKAN is described as a white male with blond hair, measuring approximately 1.83 meters in height and weighs approximately 90 kilograms.   The affidavit of Special Agent Phoenix (attached hereto as **Exhibit A**), who was present at the time of TSURKAN's arrest in Tallinn, Estonia, provides additional information as to the identification of TSURKAN, including a photograph, labeled **Attachment 1**.   TSURKAN currently remains in custody in Tallinn, Estonia.

### E. SURRENDER OF PROPERTY

25.     In accordance with Article 15 of the Extradition Treaty between the United States and Estonia, it is hereby requested that any items relevant to the charged offenses and found in TSURKAN's possession at the time of his arrest be delivered to the United Stated if he is found extraditable.

### F. SUPPLEMENTING THE REQUEST

26.     Should the Estonian authorities deciding this matter require further information in support of this extradition, the United States (through the Department of Justice Office of International Affairs) hereby requests, pursuant to Article 8 of the 2006 U.S.-Estonia Extradition Treaty, that it be given notification of any perceived deficiencies immediately, and that the United States be given an opportunity to supplement its request for extradition within a reasonable time period.

## CONCLUSION

27.     I have reviewed the affidavit of FBI Special Agent Phoenix and the evidence in this case and attest that this evidence is sufficient to justify the commitment for trial of TSURKAN for the offenses for which extradition is sought.   The affidavit, attached hereto as **Exhibit A**, was sworn to before a sitting Judge of the United States District Court for the District of Connecticut.

28.     Based upon the foregoing, the United States Attorney's Office for the District of Connecticut respectfully requests that PAVEL TSURKAN be extradited to the United States, District of Connecticut, for prosecution for the above offenses.

VANESSA RICHARDS
Assistant United States Attorney

Sworn to and subscribed before me
this 3 rd day of October 2019

THE HONORABLE KARI A. DOOLEY
United States District Judge
District of Connecticut

9

## LIST OF EXHIBITS

| | |
|---|---|
| A: | Affidavit of FBI Special Agent Conor Phoenix |
| | Attachment 1 – Photograph of Pavel Tsurkan |
| B: | Arrest warrant issued on 28 August 2019 |
| C: | Indictment returned on 3 October 2019 |
| D: | Relevant applicable federal statutes |

# EXHIBIT A

| UNITED STATES OF AMERICA | : | Case No. 3:19CR251 (MB) |
|---|---|---|
| | : | |
| -v- | : | |
| | : | |
| OLEG KOSHKIN AND | : | |
| PAVEL TSURKAN | : | |

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION OF PAVEL TSURKAN

I, Conor Phoenix, being duly sworn, depose and state as follows:

1.     I am a citizen of the United States of America, residing in Connecticut.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been so employed since 2002.   Upon reporting to the FBI's New Haven Field Office in August 2002, I was assigned (and continue to be assigned) to the office's Cyber Squad, where I have been responsible for numerous cyber investigations including, but not limited to, criminal and national security computer intrusions, crimes against children, violations of intellectual property rights, and internet fraud.   Previously, I have also spent one year working cyber aspects of counterterrorism investigations; three years serving within the Cyber Division at FBI Headquarters; and several months handling overseas cyber investigations in the Netherlands and London.    I have participated in the execution of numerous warrants involving the search and seizure of computers, computer equipment, software, and electronically stored information, such as email.    In addition to my work experience, I have received specialized training in the field of cyber investigations from the FBI and others.

3.     In the course of my duties as a Special Agent with the FBI, I have become familiar with the evidence and the charges against PAVEL TSURKAN, captioned *United States of America*

1

*v. Oleg Koshkin and Pavel Tsurkan*, 3:19CR<u>ZSI</u> (<u>MB</u>), pending in the United States District Court for the District of Connecticut.

4.     As detailed in the accompanying Prosecutor's Affidavit, TSURKAN is charged in each count of a two-count Indictment dated October 3, 2019, filed in United States District Court for the District of Connecticut.

5.     During the course of the FBI investigation, I have reviewed information provided by other members of local, state, federal, and foreign law enforcement; publicly available records; my own investigation to include interviews of witnesses, personal observations, documents and other investigative materials which I have reviewed, as well my training and experience as a law enforcement officer.

6.     As a result, the FBI investigation has revealed that, from in or about September 2013 until on or about December 28, 2017, PAVEL TSURKAN ("TSURKAN") conspired with his codefendant Oleg Koshkin and others to intentionally cause damage to a protected computer, in violation of Title 18, United States Code, Section 371; and from in or about October 2014 until on or about April 7, 2017, aided and abetted and attempted the intentional causing of damage to a protected computer, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(b), and 2.

<u>EVIDENCE OF THE CHARGED OFFENSES</u>

## A.   *Peter Levashov and the Kelihos Botnet*

7.      In May 2013, the FBI began investigating a botnet[1] named "Kelihos," believed to be operated by Peter Levashov, a.k.a. Petr Levashov, Peter Severa, Petr Severa, and Sergey Astakhov.   Levashov resided in Russia and is currently incarcerated in the United States, having pleaded guilty in the District of Connecticut on September 12, 2018 to various computer and wire fraud charges stemming from his operation of the Kelihos botnet.[2]

8.      From at least 2010 until his arrest on April   7, 2017, Levashov used Kelihos to send spam[3] e-mails and harvest e-mail credentials (such as e-mail addresses, user names, and passwords) from computers infected with the Kelihos malware and to distribute ransomware.[4] Those seeking to have their spam or ransomware distributed by Kelihos paid Levashov, who then commanded the botnet to issue the spam or distribute the malware. At the time of Levashov's arrest, Kelihos infected at least 50,000 computers, including computers in Connecticut.

## B.   *Levashov and Crypt4U*

9.      In conducting his criminal activities, Levashov used services that "crypted" the Kelihos malware so that, when the malware was distributed to victims, anti-virus software on any

---

[1] A botnet is a network of computers infected with malicious software, controlled as a group without the owners' knowledge, and used for purposes of which the legitimate owners are unaware.

[2] On April 7, 2017, Spanish authorities arrested Levashov in Spain based upon a criminal complaint and arrest warrant issued in the District of Connecticut.   He subsequently was extradited to the United States.

[3] Spam is unsolicited, usually commercial, messages (such as e-mails, text messages, or Internet postings) sent to a large number of recipients or posted in a large number of places.

[4] Ransomware is a type of malicious software designed to encrypt computer data thus rendering it inaccessible to the legitimate owner until a sum of money is paid.

victim's computer would not detect it. One of the crypting services that Levashov used was called Crypt4U. Levashov provided the Kelihos malware to Crypt4U personnel for crypting before distributing it to his victims. Levashov used these services on and off from at least May 2014 until his arrest in April 2017 and paid the operators of the crypting services approximately $3,000 per month.

10. During this time, more than 10 computers in the United States were infected with the crypted Kelihos malware. Specifically, Levashov tracked the number of infections by, amongst other indicators, country of infection and the individuals installing the Kelihos malware. Data obtained from Levashov's computer showed that just one of Levashov's affiliates – i.e. an individual paid by Levashov to install his malware on victim computers – made approximately 803 installations of Kelihos in the United States between August 2013 and January 18, 2017. Some of the victim computers that were infected by the Kelihos malware, during the period in which Levashov employed the services of Crypt4U, have been associated with specific internet protocol ("IP") addresses to which they were assigned at the time, which based on geolocation software appeared to be located within the state of Connecticut.

11. Although users of the Crypt4U service could submit malware for crypting via the Crypt4U website, Crypt4U set up a separate FTP server to deal with the unusually large volume of crypting Levashov required. File Transfer Protocol ("FTP") is, as its name implies, a networking protocol used to transfer files between a client machine and an FTP server machine. In this situation, a copy of the Kelihos malware would be transferred to the FTP server, crypted by Crypt4U, and then left in a folder on the server from which it could be downloaded. As described above, Levashov used affiliates to install Kelihos and, thus, grow his botnet. To know how much

4

he needed to pay his installers, it was necessary for Levashov to be able to track which new bots were the result of installs by a particular affiliate. As such, he could not provide two affiliates with the same crypted version of Kelihos and instead provided unique malware to each installer. Thus, Levashov would alter the malware so that he would know who had distributed it, allowing him later to determine how much he needed to pay that person as he paid per installation of the malware. This increased Levashov's demand for crypting, as did the fact that he needed to frequently crypt his malware to maintain a relatively low level of detections by antivirus software. If antivirus software on a victim machine was able to detect his malware, Levashov would potentially lose access to that machine and any others running the same antivirus software, and a decreased number of bots could impact the success of Levashov's business of distributing spam.

12. During the course of Levashov's communications with Crypt4U, members of the group disclosed that their service was tied to multiple domains, including, but not limited to, crypt4u.com and fud.bz.

13. FUD is a reference to the phrase "Fully UnDetectable". As described in the official blog of Symantec,[5] "FUD cryptors [sic] are increasingly showing up in sophisticated attack kits and their purpose is to obfuscate a malicious executable file's contents so that it can still run as it was intended, but remain unrecognizable to antivirus software."

14. While Crypt4U advertised its service on forums known to cater to malware distributors, coders, and other cyber criminals, the members of Crypt4U also operated the publicly available websites located at crypt4u.com, crypt4u.net, fud.bz, and fud.re. On or about June 4,

---

[5] Symantec Corporation is an American software company that provides cybersecurity software and services.

2014, the fud.bz website stated "Crypter works with most softs: botnets, rats, keyloggers, stealers, miners, etc." There was also a list, appearing under the heading "Not scanned", of a number of large anti-virus companies next to each of which was the term "[OK]". Based on my training and experience, I believe that fud.bz was advertising its ability to crypt pernicious and ubiquitous malware (e.g. "botnets, rats[6], keyloggers[7]") so that it would not be detected by the listed anti-virus systems.

15. Levashov's communications with Crypt4U personnel indicated that several people worked for the organization. There were individuals who handled customer service, such as answering questions and handling help ticket requests. Such individuals included the user of Jabber[8] ID ("JID") info@crypt.am and the user of various iterations of the JID "01", such as 01@default.rs, 01@xmpp.re, and 00001@exploit.im. Under the latter JID, the user was also referred to by the alias "The.". There were also individuals who handled the "backend" services, such as writing the code to automate the process of crypting malware, including Kelihos, and providing the infrastructure for Crypt4U. Two such individuals used the respective JIDs admin@crypt4u.com (hereinafter "Admin") and russian8@xta.im (hereinafter "Russian8").

16. Several of the Crypt4U members advertised the organization's services. For example, on or about September 18, 2013, Russian8 sent a private message on a criminal forum

---

[6] Remote Access Trojans are programs that provide the capability to allow covert surveillance or the ability to gain unauthorized access to a victim PC.

[7] In the context of malware, a keylogger is a type of Trojan spyware that is capable of stealing or recording user keystrokes.

[8] Jabber is an open source instant messaging and presence protocol that allows for nearly real-time communication. Jabber IDs are formatted in a manner similar to an email address (e.g. user@server.com).

known to law enforcement (hereinafter "Criminal Forum No. 1"). The message appeared designed to seek approval to post an advertisement for a new service being promoted by Russian8. In providing his bone fides to support the ad, Russian8 explained that he had been registered on criminal forums since at least 2011. In the ad itself, Russian8 wrote that the service was "the first one of its kind" because clients would be "paying us not for a one-time encryption, but for the specific time period (minimum 24 hours). After encryption, during the entire time period, your exe file will stay clean" and that the crypted executable file would usually be "re-encrypted three-five times within 24 hours."[9] He further noted that the service was planning to add a mechanism to enhance a user's executable with the following functionality: bypass UAC and disable firewalls and EOF.[10]

17. Those proposed enhancements were later described as stable functions in a very similar post made to the same forum. This post was made two days after Russian8's private message and was posted by the user DrX who used the email address Dr.X@europe.com (hereinafter "Dr.X"). At the conclusion of the advertisement, both in Russian8's private message and DrX's post, it is stated that clients could access the service by registering "on the crypt4u.com site and write to me for activation."

## C. Levashov's Communications with Crypt4U's "Admin" and "Russian8"

18. At the time of his arrest, the government seized Levashov's computers and subsequently searched them pursuant to a federal search warrant. That search yielded written

---

[9] English-language translations of the original Russian post were performed by an FBI linguist. An alternate, machine language translation produced the term "crypt" rather than "encrypt."

[10] UAC likely refers to User Account Control, which is a Windows method for establishing different privilege levels for different users (e.g. standard vs. administrator). EOF likely refers to End-of-File, a designation for the end of the data in a file.

communications from May 6, 2014 through March 2017 between Levashov and various Crypt4U personnel.

19. Many of these communications made plain that Levashov was operating a SOCKS[11] botnet. For example, on or about August 19, 2016, Levashov and Russian8 discussed Levashov's malware and how to increase the efficacy of Cyrpt4U's crypting. In the course of the conversation, the two had the following exchange[12]:

R8: There are also no detections for a longer time.
R8: That is, bots' lifespan will be longer.
R8: And when it's launched, it bypasses almost everything.
R8: Even Eset Nod32 --
R8: --which nobody can bypass.

20. Based on my training and experience, I believe that Russian8 was discussing methods to extend the period of time that Levashov's bots (i.e. computers compromised with Kelihos) could remain compromised, indicating that Russian8 was not only aware that Levashov managed bots, but also that Russian8 was assisting Levashov in evading antivirus software. Detection by antivirus software would reduce a bots' ability to live because the antivirus software should be able to remove or otherwise quarantine the malware. Russian8 noted that their crypted malware could bypass "almost everything … even Eset Nod32". Founded in 1992, ESET is a Slovakian antivirus company. NOD32 is an antivirus program sold by ESET and designed for

---

[11] SOCKS is an internet protocol that allows one computer to connect to another computer via a third computer (SOCKS server).

[12] The original exchange was in Russian and has been translated by an FBI Russian linguist and a Russian-speaking cooperating defendant who has proven truthful and reliable. All of the communications with Crypt4U personnel reported herein were originally written in Russian and so translated unless otherwise indicated.

computers running Microsoft Windows.   According to ESET's web site, it "has the longest unbroken run of … awards for malware detection of any Internet security vendor in the world."

21.     While Levashov avoided making direct statements that he operated the Kelihos botnet, there were a few discussions between Levashov and members of Crypt4U in which Kelihos was identified.   For example, on August 3, 2014, Levashov and Admin had the following exchange concerning antivirus detections of Levashov's malware, and within the listed detections certain antivirus software identified the malware as Kelihos:

| | |
|---|---|
| PL: | ARE YOU HERE? |
| PL: | EVERYTHING HAS STOPPED AGAIN AT 10:00 PM MOSCOW TIME [MSK]. |
| PL: | PLEASE LAUNCH IT ASAP, AND EVEN BETTER   - WRITE A SCRIPT WHICH WILL BE MONITORING SUCH CRAP AND RE-STARTING. |
| PL: | It started working. Now there are five antiviruses in the loader. |
| PL: | loader SHARE: |
| | Avast:Win32:Evo-gen [Susp] |
| | BitDefender:Backdoor.***Kelihos***.M |
| | F-Secure Internet Security:Gen:Variant.Graftor |
| | ESET NOD32:Trojan.Win32/Kryptik.CICD |
| | BullGuard:Backdoor.***Kelihos***.M |
| Admin: | Hi, they are cleaning your stub. I think soon it will be clean there. |

(Bold and italics added)[13]

22.     Similarly, Levashov – in addition to having a reputation as a spammer – circulated advertisements to his Jabber contacts about his services.   For example, on or about October 31, 2014, Levashov sent the following to Admin:

Good afternoon.
Each of us has enemies, bad people or just swindlers to whom we can't do anything, because it's against the law to punish them so they get what they deserve, or just clichéd there is no possibility to do that.   However, I have a solution for you – blackmailing abusers via spamming, on behalf of their resources and after that their sites/groups/forums/projects will be closed for spamming. Prices start from 1.5–2

---

[13] Avast, Bitdefender, F-Secure, ESET, and BullGuard are all antivirus software companies.

thousand dollars and each project is priced individually, in accordance with the task complexity. Contact me for personal consultation. Remember that to forgive those who left or framed you, is the choice of weak people

For english speaking users: Hello. I offer blackmailing service - mailing to abusers from your target. I can close sites/domains/groups etc for spam activity. Prices start from 1.5-2k usd, weclome [sic] for consultation.

23.     Likewise, at least one member of the organization clearly knew that Levashov was

one of the top spammers in the world, as evidenced by the following December 27, 2014 exchange

between Levashov and 01:

> 01:     I saw statistics. You are no longer among the top three spammers in the world)))
> PL:     Really? Some fagots. I'll write them a complaint letter and I'll send a copy to the Prosecutor's office.
> 01:     :D
>
> ...
> 01:     I read about you on Krebs.
> 01:     Spamhaus says Severa's real name may be Peter Levashov. The information Severa himself provided to SpamIt suggests that Spamhaus's intelligence is not far off the mark.

## D.     *Dr. X and Crypt4U*

24.     Pursuant to a federal search warrant issued by the Honorable William I. Garfinkel

on or about November 6, 2018, FBI agents reviewed incoming and outgoing emails from

dr.x@europe.com.   Contained with that data, agents located several emails further linking Dr.X

to Crypt4U.

25.     For example, on or about May 29, 2017, Name.com sent an email to the Dr.X

account confirming the transfer of the domain fud.bz to Name.com.   The email noted that "We'd

like to officially welcome you and your domains to Name.com.   Your domain transfer has

completed, and your registrations have been extended for another year."   On or about March 1,

2018, Name.Com sent an email to the Dr.X account concerning its "Whois Data Reminder Policy".

As the email explained, the recipient was "required to have accurate contact information whether your Whois data is public, or privatized. If any of the Whois information for your domain names is inaccurate, ICANN policy requires that you correct it. Please know that under the terms of your registration agreement in certain cases the provision of false Whois (contact) information can be grounds for cancellation of your domain name registration." Based on my training and experience, I know that Whois is a tool used for querying registered users or assignees of, *inter alia*, domain names. Further, the Internet Corporation for Assigned Names and Numbers, or ICANN, is a nonprofit organization responsible for coordinating the maintenance and procedures of several databases related to, *inter alia*, domain names.

26. In the email, Name.com listed all of the domains registered by Dr.X with the company. Among the 26 registered domains was fud.bz, which the email noted was created on or about May 21, 2014.[14]

## E. *Probable Cause that Oleg Koshkin Used the Aliases Admin and Dr. X*

27. There is probable cause to believe and I do believe that Koshkin used the aliases Admin and Dr. X in connection with Crypt4U.

28. According to a Whois Lookup, the registrant for three of the four websites associated with Crypt4U was Oleg Koshkin of Tallinn, Estonia with a phone number of 37255578222 and an email address of koshkin.oleg@gmail.com. Whois information for domains crypt4u.com, crypt4u.net and fud.re list Oleg Koshkin as a contact/registrant. The phone number 37255578222 and the email address koshkin.oleg@gmail.com are the most consistent means of

---

[14] This is the only Crypt4U domain that was not registered in Koshkin's true name. The registrant's name was Antoshka Kartochka and the subscriber email at registration was pp.thailand@asia.com, which as discussed *supra* is subscribed to by Tsurkan.

contact listed for Koshkin throughout the Whois history of these domains and can both be found in the registration information for each domain, depending on the timeframe in question.

29.     On September 29, 2016, a Russian national named Oleg Koshkin submitted an application for a visa to travel to the United States.   In that application, he stated that he lived in Tallinn, Estonia and his email address was koshkin.oleg@gmail.com.   Koshkin listed his primary occupation as computer science and elaborated that he had his own company, Wirel OU, and offered services about automatization.

30.     In Levashov's Jabber communications with Crypt4U personnel, the personnel refer to an individual believed to be Oleg Koshkin as "admin" and "the programmer" for the crypting service. Specifically, on December 12, 2015, Levashov wrote a person using the JID crp4u@default.rs to complain about failures in the crypting.   In responding to Levashov, crp4u@default.rs pasted four lines of chat messages.   Crp4u@default.rs informed Levashov that the pasted messages were what "admin" had told crpt4u@default.rs to send to Levashov.   The pasted messages from crp4u@default.rs did not list a JID, but rather the other user had been identified by crp4u@default.rs as someone with the name "Oleg":

```
crp4u:      Fuck, my colleague asked me to let you know.
crp4u:      Oleg: So, in short, the FTP owner [PH] has a different FTP on a new
            server.
            ftp://client01:123123123@51.255.103.238
            Oleg: You [plural] need it for testing and it needs to be relayed to
            him too. I don't remember his Jabber.
            Oleg: Now there are no encryptions on his old FTP, only on the new
            one.
            Oleg: So either you write him or he'll start telling that the robot has
            stopped.
crp4u:      This is what admin passed along to us and he asked us to pass it on
            to you.
```

31.     Similarly, on or about January 28, 2016, Levashov and 01 discussed complaints Levashov had with Crypt4U and asked Levashov to write the "programmer", providing the programmer's JID as olegvic@jabber.no.

32.     Additionally, on or about January 29, 2015, Crypt4U employee 01 using JID vxxxxv@0nl1ne.at wrote to Levashov that the "programmer" would address Levashov's concerns in the evening.   01 then stated that programmer "had his birthday and he got lost somewhere in the woods." Koshkin's birthday is January 28, 1980.

33.     A search of various communication and social networking platforms revealed multiple accounts associated with Koshkin.   That search also revealed additional information that connected Koshkin to the olegvic@jabber.no JID or the nickname "oleg v" or "oleg vic". For instance, a search of Skype for the email address koshkin.oleg@gmail.com identified an account holder with the user name "oleg v.", along with the full name "Oleg" and a location listed as "Tallinn, Estonia ee Harju".[15]   A similar search of Twitter for the same email address identified an account holder with the user name "OlegVic" and a display name of "Oleg Koshkin" from Harjumaa, Tallinn.[16]

34.     On April 4, 2015, the JID olegvic@jabber.no was also provided on Criminal Forum 1 when a participant queried the forum's community, "looking for a good programmer and a crypter for a bot."   In response, Russian8 wrote that he had a programmer with the JID olegvic@jabber.no and that olegvic@jabber.no was from the crypt4u.com team.

---

[15] Tallinn, the capital of Estonia, is located in Harju County, in northern Estonia.   EE is the two letter ISO country code for Estonia.

[16] Harjumaa is an alternate spelling for Harju County (written in Estonian as Harju maakond).

35. In addition, the FBI identified one Skype account associated with dr.x@europe.com. The user name for the account holder was listed as "oleg v"; the full name was listed as "Oleg"; and, the location was listed as "Tallinn Estonia ee Harju". This user provided information mirrors the Skype account information listed under the account associated with koshkin.oleg@gmail.com.

36. Moreover, based on records obtained from Cloudflare, Inc., Cloudflare managed the internet traffic associated with the Crypt4U domains. On July 20, 2018, Cloudflare registered a login from IP address 89.235.220.18 by Cloudflare User ID 1407323. Subscriber information for this user included the user name "olegvic" and the email address koshkin.oleg@gmail.com. This user's account was associated with a number of active and purged domains, to include crypt4u.com, crypt4u.net, fud.bz and fud.re. Two days prior to this login at Cloudflare, records from 1&1 Mail showed that the email address dr.x@europe.com was accessed from the same IP address, 89.235.220.18.

37. The dr.x@europe.com email account also contained data linking Koshkin further to Crypt4U. Specifically, on or about May 2, 2014, an email was sent to ROBOKASSA Support from the dr.x@europe.com account with the subject "Re: #Issue#828868: Request updated." According to its website, ROBOKASSA is "a service which helps Merchants (online stores or service providers) accept payments from bank cards, in any e-currency, through mobile commerce services (MTS, Megafon, Beeline), online banking systems of leading Banks in Russia, ATMs or instant payment terminals, and iPhone applications." The preceding exchanges between the dr.x@europe.com account and ROBOKASSA, which were included further down in the email, included an apparent response from a representatives from ROBOKASSA to a request from

"Oleg" using the email Dr.X@europe.com to use the company's services for "[c]hecking the site for compliance."[17]  The "site" was listed as "http://crypt4u.com/".   In furtherance of this request, a representative from ROBOKASSA asked "what exactly you plan to accept payments on your site for?"   In response, Dr.X wrote "Thank you all, we have already automated."   Based on my training and experience, I believe that Dr.X was inquiring about ROBOKASSA's ability to provide payment processing services for his site crypt4u.com, suggesting that Dr.X owned or controlled that website.

38.    Koshkin received notifications from WebMoney Transfer ("WebMoney") about activity in his account via email to his koshkin.oleg@gmail.com account further linking Koshkin to Crypt4U.

39.    Webmoney describes itself as "a global settlement system and environment for online business activities...."   WebMoney account holders are assigned a WebMoney identifier ("WM ID").   Multiple "purses" can be attributed to each WM ID and each purse number is preceded by an alphabetical character which denotes the "property rights of different types of valuables."   For example, a Z-Purse is described as "a certificate for purchase of products and services...in US Dollars."

40.    Specifically, starting in May 1, 2014, through May 21, 2014, the header information of these WebMoney email notifications listed the "Return-Path" as "admin@crypt4u.com", which is the JID used by admin when communicating with Levashov.

41.    Additionally, on or about May 19, 2014, a WebMoney notification sent to the koshkin.oleg@gmail.com account indicated that 705 WMZ had been deposited into an account

---

[17] Translated from Russian to English using Google Translate

associated with WM ID 385851025477 from "the correspondent 271132864727." This notification was forwarded from the email account koshkin.oleg@gmail.com to the email address payments@crypt4u.com.

42.     According to data from the dr.x@europe.com account, WM ID 385851025477 belongs to Koshkin.    Specifically, on or about June 29, 2016, an email was sent from the dr.x@europe.com account to another individual, attached to which was a screenshot evidencing a WebMoney payment for a service.    The email noted that the service was the hacking of an email account on behalf of Dr.X.    The screenshot reflected that the payment was made from an account in the name of "Koshkin Oleg Viktorovich"[18] using purse R178956724097 associated with WebMoney Identifier of 385851025477.

43.     Moreover, according to records obtained from WebMoney, the correspondent 271132864727, identified in the May 19, 2014, email referenced above, is a WebMoney identifier associated with Tsurkan.    Specifically, the subscriber of this identifier is Larissa Olivson and the email of record is pp.thailand@asia.com. According to Estonian authorities, Olivson was married to Tsurkan and as detailed below, Tsurkan is user of the pp.thailand@asia.com account. Moreover, as detailed below, Levashov paid money to purses belonging to Tsurkan for Crypt4U's crypting services.

### F.     *Probable Cause that Pavel Tsurkan Used Alias Russian8*

44.     As detailed below, there is probable cause to believe and I do believe that Pavel Tsurkan used the alias Russian8 and is associated with Crypt4U.

---

[18] Translated from Russian using Google Translate.

45.     The email address russian8@live.ru was used to register the user name "Russian8" on Criminal Forum 1 discussed *infra*. A search of Skype for the email address russian8@live.ru was found to be associated with an individual with the user name pavel.tsurkan.valerjevich, the display name Pavel Tsurkan Valerjevich, and the location of Tallinn, Estonia.

46.     Additionally, Tsurkan is connected to Crypt4U's infrastructure.    During the period that Levashov employed the services of Crypt4U, many IP addresses were utilized by Crypt4U personnel to help facilitate their crypting of the Kelihos malware and the "loader" program used to download Kelihos.    Specifically, prior to redistributing the crypted Kelihos malware back to Levashov, Crypt4U would test the efficacy of its crypting by running the crypted Kelihos executable on various versions of the Windows operating system from the same IP address.    Crypt4U then would look for certain indicators, such as network traffic, to see if the crypted version worked properly. When Crypt4U conducted these tests from the same IP address, the Kelihos infrastructure would accidentally "blacklist" the IP address because the botnet was programmed to interpret multiple requests for connection to the botnet from a single IP address as suspicious and to drop the connection. Therefore, in order for Crypt4U to conduct its tests, its personnel had to provide Levashov with the IP addresses from which they conducted their test runs.

47.     For instance, on April 19, 2016, the Crypt4U representative 01 (and identified by the alias "The.") made reference to the IP address 188.68.248.90 when communicating with Levashov.    A translation of that portion of text reads as follows:

The.:   Please remove 188.68.248.90 from a blocklist.
The.:   This is our temporary IP which we use for testing. We'll change it within a couple
        days.

17

48. Despite the statement of the IP changing "within a couple days", the IP address was still being utilized several months later in November 2016, as evidenced from the following exchange:

The.: I need information about which ones produced replies.
The.: And isn't our IP in the whitelist?
The.: For the last hour --
The.: -- send me machines which produced responses.
The.: Two Poland.
The.: Our account.
PL: Are you here?
PL: There are no responses today. It seems there were no complaints yesterday.
PL: Tell me the IP address.
The.: 188.68.248.90

49. Further investigation determined that IP address 188.68.248.90 was registered to the Polish company Sprint S.A. ("Sprint"). Records from Sprint indicated that from April 11, 2016 until December 11, 2016, the IP address 188.68.248.90 was registered to CloudLife OU, Punane tn 39-75, 13611 Tallinn, with contact details of pavel@cloudlife.ee and +37.254666666.

50. Various online searches of public Web sites evidence that Tsurkan is a board member of Cloudlife OU. Specifically, two sites[19] provide that CLOUDLIFE OÜ was registered on March 21, 2016 (Reg. Code 14017607), is located at Harjumaa, Tallinn, Punane tn 39-75, 13611, with a telephone number of (+372)54666666, and a contact email address of koshkin.oleg@gmail.com. These sites also provided that the company's board members were Oleg Koshkin and Pavel Tsurkan.

---

[19] Specifically, https://www.inforegister.ee/en/14017607-CLOUDLIFE-OU and https://www.teatmik.ee/en/personlegal/14017607-CloudLife-OU.

18

51.     In addition, a search of various social networking and messaging platforms, using the CLOUDLIFE OÜ telephone number, (+372)54666666, identified a Viber[20] account for a user with the name "Pavel", as well as a Telegram[21] account for a user with the name "Pavel Who". The profile picture for the Telegram user, who was "last seen online" in August 2018, was an image of the flag of Thailand.[22]

52.     The Sprint records also included correspondence between Sprint and the account holder.    In one exchange on or about June 1, 2016, the company contacted "support@cloudlife.ee" to report that Sprint had "received a report of abuse about IP address 188.68.248.90", the same IP that Crypt4U used to test Levashov's malware.    *See infra* ¶47. That message was then forward to "Pavel Tsurkan pavel@cloudlife.ee" who responded:

> Hello,
> I got this abuse just now. Tell me plaese what happend?
> We didnt send any emails (spam).
> Thanks

53.     As noted previously, one of the domains utilized by members of Crypt4U was identified as fud.bz.    A Whois search for the domain fud.bz revealed that it had been created on May 21, 2014.    Although registered under the name "Antoshka Kartochka", the registrant also supplied email address pp.thailand@asia.com.    U.S. Authorities obtained records related to email

---

[20] Viber is a cross-platform calling and messaging application which uses end-to-end encryption its users' communications.    Viber calls utilize voice over IP (VoIP), which is the transmission of voice and multimedia content over the internet.

[21] Telegram is a cloud-based mobile and desktop instant messaging and VoIP service.

[22] On January 11, 2019, the Estonian Central Police advised the FBI that both Oleg Koshkin and Pavel Tsurkan would travel through Russia to Thailand.    They would generally leave in September or October and stay in Thailand for six to eight months.

pp.thailand@asia.com, and those records listed the subscriber's name as Pavel Tsurkan. Tsurkan had registered his email address on September 11, 2012, and the country was identified as Estonia.[23]

54.     Additionally, as discussed above, Levashov paid Crypt4U for its crypting service through WebMoney. Over the course of his dealings with Crypt4U, Levashov was provided with multiple purses to which he was instructed to transfer payment. For instance, on or about June 1, 2014, the Crypt4U member support@crypt4u.com advised that Levashov should send money to purse Z114013160496. Records obtained from WebMoney showed that this purse belonged to WM ID 271132864727 which was subscribed to Tsurkan's former wife and registered with his email of pp.thailand@asia.com, as discussed *infra*.

55.     Finally, records provided by the Estonian government contained a file entitled "Population register", which provided the following contact information for Pavel Tsurkan reported by the Estonian Police and Border Guard Board: telephone number 54666666 – the Cloudlife OU telephone number – and email pp.thailand@asia.com. The "Population register" also provided the following contact information for Tsurkan reported by the Estonian Road Administration: russian8@live.ru.

56.     On December 20, 2016, Crypt4U member 01 (The.) wrote the following to Levashov: "Please include 188.68.240.30 in whitelist – server has changed." Records previously collected by Estonian authorities included packet capture information from Tsurkan's residence. On December 26, 2016, Tsurkan's residential IP address accessed the IP address 188.68.240.30.

---

[23] Records listed the country using the internet country code top-level domain "EE", which corresponds to Estonia.

57.    One month later, on January 26, 2017, 01 reiterated the following: "Your new IP is 188.68.240.30, and it used to be 188.68.248.90".    On February 5, 2017, Tsurkan's home IP address again accessed IP address 188.68.240.30.    The time was approximately 11:27:14.    At approximately 11:27:41 on the same day, Tsurkan's home IP accessed a website, logging in under the username russian8.

## IDENTIFICATION

58.    TSURKAN is an Estonian citizen, born on January 2, 1988 in Tallinn, Estonia. TSURKAN is described as a white male with blond hair, measuring approximately 1.83 meters in height and weighs approximately 90 kilograms.    On September 6, 2019, I was present when, following his arrest, TSURKAN was in custody at the Estonian Central Criminal Police Headquarters in Tallinn, Estonia.    At that time, I observed TSURKAN and can confirm that he is the man depicted in the photograph attached hereto (Attachment 1). Additionally, during a post arrest statement, TSURKAN acknowledged his association with Crytp4U and that he had used the Russian8 alias.

59.    This affidavit is sworn before a District Judge of the United States District Court for the District of Connecticut, who is a person duly empowered to administer an oath for these purposes.

CONOR PHOENIX
Special Agent, U.S. Federal Bureau of Investigation

Sworn to and subscribed before me
this 28 day of October 2019.

THE HONORABLE KARI A. DOOLEY
United States District Judge
District of Connecticut

21

**ATTACHMENT 1**
**PHOTOGRAPH OF PAVEL TSURKAN**



# EXHIBIT B

# UNITED STATES DISTRICT COURT

for the

District of Connecticut

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. 3:19mj1332 (WIG) |
| Pavel Tsurkan | ) |
| *Defendant* | ) |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*     Pavel Tsurkan                                                                                           ,
who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment         ❏ Superseding Indictment       ❏ Information       ❏ Superseding Information       ☑ Complaint
❏ Probation Violation Petition       ❏ Supervised Release Violation Petition       ❏ Violation Notice     ❏ Order of the Court

This offense is briefly described as follows:

See Attached Affidavit of FBI S.A.  Conor Phoenix

Date:     8/28/19

_____
*Issuing officer's signature*

City and state:     Bridgeport, Connecticut

William I. Garfinkel, U.S. Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                                    _____<br>*Arresting officer's signature*<br><br>_____<br>*Printed name and title* |

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____    Weight: _____

Sex: _____    Race: _____

Hair: _____    Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*:

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

GRAND JURY B-18-1

2019 OCT -3 P 1: 14

US DISTRICT COURT
BRIDGEPORT CT.

UNITED STATES OF AMERICA

v.

OLEG KOSHKIN and
PAVEL TSURKAN

CRIMINAL NO. 3:19CR_____

VIOLATIONS: 3:19cr251(mps)

18 U.S.C. § 371
(Conspiracy)

18 U.S.C. §§ 1030(a)(5)(A), 1030(b) and 2
(Aiding and Abetting Intentional Damage to
a Protected Computer)

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times relevant to this Indictment, unless otherwise specified:

1.      The defendant OLEG KOSHKIN ("KOSHKIN") is a citizen of Russia who resides in Estonia and Thailand.

2.      The defendant PAVEL TSURKAN ("TSURKAN") is a citizen of Estonia who resides in Estonia and Thailand.

3.      Peter Yuryevich Levashov, a.k.a. "Petr Levashov," "Peter Severa," "Petr Severa," and "Sergey Astakhov" ("Levashov"), who is not named as a defendant herein, but is charged elsewhere, is a citizen of Russia who last resided in Russia.

4.      Jabber is an open source instant messaging and presence protocol that allows for nearly real-time communication.

5.     WebMoney is an online payment and money transfer service. WebMoney account holders are assigned a unique WebMoney identifier. A WebMoney user's funds are stored in an electronic "purse." Multiple "purses" can be attributed to each WebMoney identifier.

## Background on Malicious Software and Spam

6.     Malicious software ("malware") is a software program designed to disrupt computer operations, gather sensitive information, gain unauthorized access to a computer, or do other unwanted actions on a computer.

7.     A "botnet" is a network of computers infected with malware that allows a third party to control the entire computer network without the knowledge or consent of the computer owners. Each of the infected computers is referred to as a "bot." Some botnets can be used by spammers to send spam through the network of infected bot computers, using each of the infected computers to transmit the spam email, in order to hide the true origin of the spam, obscure the identity of the spammer, and evade anti-spam filters and other blocking techniques.

8.     A "Trojan" is a type of malware that masquerades as a routine download request or an innocuous file that encourages the victim to open it and consequently unknowingly install malware onto the victim computer, thereby creating an unauthorized access exploit to the victim computer.

9.     A "keylogger" is a type of malware that is capable of stealing or recording user keystrokes.

10.     "Remote Access Trojans," also known as "rats," are a type of malware that provide the capability to allow covert surveillance or the ability to gain unauthorized access to a computer.

11.     "Ransomware" is a type of malware that encrypts an infected computer's files and demands payment to unlock the computer.

2

12.     "Spam" messages are unsolicited bulk commercial email messages.

## COUNT ONE
(Conspiracy)

13.     Paragraphs 1 to 12 are incorporated by reference.

14.     From approximately September 2013 until approximately December 28, 2017, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants KOSHKIN and TSURKAN did knowingly and intentionally combine, conspire, confederate, and agree with each other and with Levashov and others unknown to the Grand Jury to commit offenses against the United States, that is, to knowingly attempt to cause and cause the transmission of a program, information, code, and command, and as a result of such conduct, intentionally cause damage without authorization, to 10 or more protected computers during a one-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(b), and 1030(c)(4)(B).

## Manner and Means of the Conspiracy

15.     It was part of the conspiracy that between approximately September 2013 and approximately December 28, 2017, the defendants KOSHKIN and TSURKAN controlled and operated an online service known as Crypt4U. Crypt4U was a service that crypted malware in order to avoid detection by antivirus software, including popular antivirus software used by many computer users in the United States. The purpose and intent of the defendants and their co-conspirators in operating Crypt4U was to allow distributers and coders of malware to reduce the chances that the malware would be detected by antivirus software installed on the computers they target. As such, the defendants and co-conspirators knew and intended that Crypt4U would be used to enable and facilitate the installation of malware on computers without the authorization of the computers' owners.

3

16.     It was further part of the conspiracy that other individuals also worked for Crypt4U and assisted the defendants KOSKHIN and TSURKAN in operating Crypt4U.

17.     It was further part of the conspiracy that users of Crypt4U were charged a fee to crypt malware.

18.     It was further part of the conspiracy that the defendants KOSHKIN and TSURKAN advertised Crypt4U on various websites, including public sites crypt4u.com, crypt4u.net, fud.bz, and fud.re. They also advertised Crypt4U on various online forums known to cater to malware distributors, coders, and other cyber criminals. As a result, the defendants knew and intended that Crypt4U would be used for the facilitation of criminal activity.

19.     It was further part of the conspiracy that Levashov controlled and operated the Kelihos botnet. Levashov used the Kelihos botnet to, among others things: (1) harvest personal information and means of identification (including email addresses, usernames and logins, and passwords) from infected computers; (2) disseminate spam; and (3) distribute malware, including Trojans and ransomware. Individuals or organizations seeking to have their spam or ransomware distributed by Kelihos paid Levashov, who then commanded the botnet to issue the spam or distribute the malware.

20.     It was further part of the conspiracy that Levashov used and paid affiliates to transmit and install the Kelihos malware on victim computers, and thus, grow his botnet.

21.     It was further part of the conspiracy that Levashov used Crypt4U to crypt the Kelihos malware so that, when the malware was distributed to victims, antivirus software on any victim's computer would not detect it.

22.     It was further part of the conspiracy that because of the way Levashov tracked new installations by a particular affiliate, Levashov could not provide two affiliates with the same

4

crypted version of Kelihos; thus, he needed to provide unique malware to each affiliate so that he would know which affiliate had distributed it and how much he needed to pay that person as he paid per installation of the malware. This increased Levashov's demand for crypting.

23.    It was further part of the conspiracy that Levashov used Crypt4U from at least May 2014, until April 7, 2017, and paid the operators of Crypt4U approximately $3,000 per month. Over the course of his dealings with Crypt4U, Levashov was provided with multiple WebMoney purses to which he was instructed to transfer payment.

24.    It was further part of the conspiracy that by April 7, 2017, the Kelihos botnet infected at least 50,000 computers, including computers in Connecticut. The computers infected with the Kelihos botnet were used in and affecting interstate and foreign commerce and communication.

25.    It was part of the conspiracy that Levashov and his co-conspirators did not seek, nor were they given, permission of the owners of the victim computers to install the Kelihos botnet on victims' computers and to use the victims' computers as part of the Kelihos botnet.

### Overt Acts

26.    In furtherance of the conspiracy and to effect the objects thereof, KOSHKIN, TSURKAN, Levashov, and other co-conspirators committed, and caused to be committed the following overt acts in the District of Connecticut and elsewhere:

a.    On or about September 20, 2013, an advertisement was posted for Crypt4U on an online criminal forum known to the Grand Jury.

b.    On or about September 2, 2013, KOSHKIN registered the domain name crypt4u.com.

c.      On or about January 7, 2014, KOSHKIN registered the domain name crypt4u.net.

d.      On or about May 21, 2014, TSURKAN, using an alias, registered the domain name fud.bz.

e.      On or about June 1, 2014, a Crypt4U representative sent a message via Jabber to Levashov advising Levashov to send money to a WebMoney purse, which is known to the Grand Jury, and is associated with an account that TSURKAN created in his former wife's name.

f.      On or about June 4, 2014, the fud.bz website, which advertised the crypting service, stated "Crypter works with most softs: botnets, rats, keloggers, stealers, miners, etc." The website further provided a list of a number of large anti-virus companies next to each of which was the term "[OK]." The purpose of these statements was to advertise Crypt4U's ability to crypt malware so that it would not be detected by the listed antivirus software.

g.      On or about January 24, 2015, KOSHKIN registered the domain name fud.re.

h.      On or about December 12, 2015, Levashov and a Crypt4U representative exchanged messages via Jabber discussing a complaint that Levashov had with Crypt4U, during which "Oleg" [KOSHKIN] was identified as Crypt4U's "Admin."

i.      On or about January 28, 2016, Levashov and a Crypt4U representative exchanged messages via Jabber discussing a complaint that Levashov had with Crypt4U, during which the Jabber ID for the Crypt4U programmer was identified as olegvic@jabber.no.

j.      On or about March 24, 2016, a Crypt4U representative sent a Jabber message to Levashov providing him with an internet protocol ("IP") address for a file transfer

6

protocol server so that Levashov could transfer the Kelihos malware to Crypt4U in order to be crypted.

   k.  On or about August 19, 2016, TSURKAN sent messages via Jabber to Levashov discussing Levashov's malware and how the crypted malware could bypass antivirus software.

   l.  Between approximately December 29, 2016, and March 13, 2017, the exact date being unknown to the Grand Jury, the Kelihos malware was transmitted and installed on a computer assigned internet protocol ("IP") address 96.67.50.137.

   m.  Between approximately December 29, 2016, and March 13, 2017, the exact date being unknown to the Grand Jury, the Kelihos malware was transmitted and installed on a computer assigned IP address 24.218.138.137.

   n.  Between approximately December 29, 2016, and March 13, 2017, the exact date being unknown to the Grand Jury, the Kelihos malware was transmitted and installed on a computer assigned IP address 69.94.24.124.

   o.  Between approximately December 29, 2016, and March 13, 2017, the exact date being unknown to the Grand Jury, the Kelihos malware was transmitted and installed on a computer assigned IP address 69.126.128.244.

   p.  Between approximately December 29, 2016, and March 13, 2017, the exact date being unknown to the Grand Jury, the Kelihos malware was transmitted and installed on a computer assigned IP address 24.2.180.202.

   q.  On December 28, 2017, the registration of the domain fud.re, registered to the Name.com user OlegVic, was successfully renewed.

  All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
(Aiding and Abetting Intentional Damage to a Protected Computer)

27.     Paragraphs 1 to 25, and 26(g)-(q), are incorporated by reference.

28.     From approximately October 2014 until approximately April 7, 2017, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants KOSHKIN and TSURKAN aided and abetted Levashov to knowingly attempt to cause and cause the transmission of a program, information, code, and command, to wit, the Kelihos botnet, and, as a result of such conduct, intentionally caused damage without authorization to a protected computer, and the offense caused damage affecting 10 or more protected computers during any one-year period.

All in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(b), 1030(c)(4)(B), and 2.

A TRUE BILL.

_____
FOREPERSON

UNITED STATES OF AMERICA

_____
LEONARD C. BOYLE
FIRST ASSISTANT UNITED STATES ATTORNEY

_____
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY

_____
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY

8

## EXHIBIT D

### Exhibit D – Relevant Federal Statutes

#### Title 18, United States Code, Section 371

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

#### Title 18, United States Code, Sections 1030 (a)(5)(A) and (b)

(a)  Whoever—

(5)(A)  knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer; or

(b)  … conspires to commit or attempts to commit an offense under subsection (a) of this section

shall be punished as provided in subsection (c) of this section.

\* \* \*

(c) The punishment for an offense under subsection (a) or (b) of this section is—

(B) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 10 years, or both, in the case of--

(i) an offense under subsection (a)(5)(A), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused) –

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value; … or

(VI) damage affecting 10 or more protected computers during any 1-year period; or

(ii) an attempt to commit an offense punishable under this subparagraph;

11

* * *

(e) As used in this section—

(1) the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2) the term "protected computer" means a computer--

(B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

(8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

(10) the term "conviction" shall include a conviction under the law of any State for a crime punishable by imprisonment for more than 1 year, an element of which is unauthorized access, or exceeding authorized access, to a computer;

(11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

(12) the term "person" means any individual, firm, corporation, educational institution, financial institution, governmental entity, or legal or other entity.

* * *

(i)(1)  The court, in imposing sentence on any person convicted of a violation of this section, or convicted of conspiracy to violate this section, shall order, in addition to any other sentence imposed and irrespective of any provision of State law, that such person forfeit to the United States—

(A)  such person's interest in any personal property that was used or intended to be used to commit or to facilitate the commission of such violation; and

(B)  any property, real or personal, constituting or derived from, any proceeds that such person obtained, directly or indirectly, as a result of such violation.

**Title 18, United States Code, Section 2 - Principals**

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**Title 18, United States Code, Section 3282 - Offenses not capital**

(a) Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

**Title 18, United States Code, Section 981- Civil forfeiture**

(a)(1) The following property is subject to forfeiture to the United States:

\* \* \*

(C)     Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of section 215, 471, 472, 473, 474, 476, 477, 478, 479, 480, 481, 485, 486, 487, 488, 501, 502, 510, 542, 545, 656, 657, 670, 842, 844, 1005, 1006, 1007, 1014, 1028, 1029, 1030, 1032, or 1344 of this title or any offense constituting "specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

**Title 28, United States Code, Section 2461 - Mode of recovery**

(a) Whenever a civil fine, penalty or pecuniary forfeiture is prescribed for the violation of an Act of Congress without specifying the mode of recovery or enforcement thereof, it may be recovered in a civil action.

\* \* \*

(c)     If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case pursuant to to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code. The procedures in section 413 of the Controlled Substances Act (21 U.S.C. 853) apply to all stages of a criminal forfeiture proceeding, except that subsection (d) of such section applies only in cases in which the defendant is convicted of a violation of such Act.

13

## Title 21, United States Code, Section 853 – Criminal forfeitures

* * *

(p)  Forfeiture of substitute property

(1)  In general Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant—

(A)  cannot be located upon the exercise of due diligence;

(B)  has been transferred or sold to, or deposited with, a third party;

(C)  has been placed beyond the jurisdiction of the court;

(D)  has been substantially diminished in value; or

(E)  has been commingled with other property which cannot be divided without difficulty.

* * *